CC-1998-1006                                                               1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Plácido Serrano Vélez;<br>Angélica Vélez Torres<br>　　　Demandantes-Recurridos<br><br>　　　　　v.<br><br>Estado Libre Asociado de Puerto Rico;<br>Departamento de Corrección y Rehabilitación, et<br>al.<br>　　　Demandados-Recurrentes | Certiorari<br><br>2001 TSPR 92 |

Número del Caso: CC-1998-1006

Fecha: 18/junio/2001

Panel Integrado por su Presidenta, Jueza Fiol Matta, la Jueza Rodríguez de Oronoz y el Juez González Román

Oficina del Procurador General:
　　　　　　　　　　Lcdo. Héctor Clemente Delgado
　　　　　　　　　　Procurador General Auxiliar

Abogado de la Parte Recurrida:
　　　　　　　　　　Lcdo. Jorge L. Santiago Carrasquillo

Materia: Revisión Administrativa

　　　Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Plácido Serrano Vélez;
Angélica Vélez Torres

        Demandantes-Recurridos

           v.

Estado Libre Asociado de        CC-1998-1006
Puerto Rico; Departamento
de Corrección y Rehabilitación;
Hydia Cotto Vives, Secretaria;
Administración de Corrección,
Zoe Laboy, Administradora

        Demandados-Recurrentes

SENTENCIA

San Juan, Puerto Rico, a 18 de junio de 2001.

I

El confinado Plácido Serrano Vélez (en adelante, el recurrido) se encuentra recluido en prisión desde el año 1977. Su reclusión surge a consecuencia de distintos actos criminales cometidos por éste, la mayoría delitos graves. Por la gravedad de sus delitos, el recurrido se encuentra extinguiendo penas que, en total, suman 204 años de prisión.

El 29 de agosto de 1990 el recurrido fue trasladado del Centro de Detención Regional de Guayama a la Institución Regional del Oeste en Mayagüez. El traslado se efectuó a raíz de una

confidencia en la cual se informaba los planes de fuga de la cárcel de Guayama, por parte de un grupo de reos encabezado por el recurrido. Posteriormente, el 10 de diciembre de 1990, el Superintendente IV del Centro de Detención del Oeste, le informó mediante carta a la Directora del Negociado de Instituciones Penales de la Administración de Corrección, que en la Sección de Máxima Protectiva tenía ubicados a catorce confinados de Máxima Seguridad los cuales se habían fugado anteriormente de la Institución Regional de Guayama. Indicó que este grupo había encabezado una revuelta para alterar el orden y la seguridad institucional de la cárcel de Guayama, y que había recibido confidencias fehacientes advirtiendo que el grupo estaba planificando tomar rehenes para así lograr salir de la Institución. Explicó además que el grupo estaba amenazando que si fracasaba en su intento de negociación con la Administración de Corrección, provocaría que los reclusos arrancasen los tubos de las barandas del segundo y tercer nivel para con ellos romper los cristales del "Control Room" y así lograr apoderarse de todo el edificio. Indicó también que el grupo intentaría masacrar a los confinados del bando contrario que se encontraban ubicados en la Sección de Máxima-Máxima. Finalmente, entendía el Sr. Guerra Sánchez que dada las características de esos confinados no tenía dudas de que el grupo intentaría hacer lo que había planificado para lograr sus propósitos.

Consecuentemente, ante este cuadro de emergencia, a la luz del expediente del recurrido, y el grave peligro que implicaba la situación, el 22 de diciembre de 1990 el recurrido fue trasladado a seguir cumpliendo su pena de reclusión en una institución correccional en los Estados Unidos. La determinación se basó en un convenio establecido entre el Negociado Federal de Prisiones y la Administración de Corrección.

Diez días más tarde, el 2 de enero de 1991, la Dra. Mercedes Otero de Ramos, Administradora de Corrección, remitió una carta a la Sra. Angélica Vélez Torres (en adelante, la recurrida) progenitora del recurrido Serrano Vélez, para informarle sobre el traslado realizado. Le indicó que el traslado se había efectuado al amparo de la Sección X(4) del Reglamento denominado *Procedimiento para el Traslado de Sentenciados o de Confinados Sentenciados a Instituciones Penales en Estados Unidos*. Además, le expresó que de acuerdo a la información recogida y el análisis del expediente del confinado Serrano Vélez era forzoso concluir que la permanencia de éste en el sistema penal de Puerto Rico representaba un grave riesgo a la seguridad de confinados, empleados, y a la sociedad en general.

El 16 de junio de 1997, el representante legal de los recurridos envió una carta al Secretario de Justicia imputando la ilegalidad del traslado del confinado Serrano Vélez. Solicitó, asimismo, que lo regresasen a Puerto Rico.

Al no recibir respuesta, el 6 de agosto de 1997, los recurridos presentaron en el Tribunal de Primera Instancia una demanda al amparo de la sección 1983 de la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983; los artículos 1802 y 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 5141 y 5142; el Art. 1 de la Ley Núm. 12 de 8 de agosto de 1974, 32 L.P.R.A.

sec. 3524; y el Art. 2(a) de la Ley de Reclamaciones y Demandas Contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. secs. 3077(a). En esencia, los recurridos alegan que la Administración de Corrección trasladó arbitraria y caprichosamente al confinado Serrano Vélez a una institución correccional en los Estados Unidos sin haberle reconocido las garantías mínimas del debido proceso de ley. Solicitaron como remedio que se declarara la ilegalidad del traslado del confinado y que se ordenara su regreso a Puerto Rico.

El 29 de octubre de 1998 el TPI dictó sentencia parcial librando auto de *injunction*, dejando sin efecto la orden de traslado del confinado de 22 de diciembre de 1990. Se ordenó además que la Administración de Corrección adquiriese la custodia del recurrido para regresarlo inmediatamente a Puerto Rico. De esa determinación parcial recurrieron ante el Tribunal de Circuito de Apelaciones, (en adelante, el TCA) la Administración de Corrección, la Secretaria de Corrección y Rehabilitación y el Estado Libre Asociado (en adelante, los recurrentes).

El 23 de noviembre de 1998 el TCA emitió resolución denegando la expedición del auto de *certiorari* solicitado y la moción en auxilio de jurisdicción. En esencia, el TCA acogió los fundamentos expuestos por el foro de instancia. El 15 de diciembre de 1998 los recurrentes presentaron ante este Tribunal una Petición de *Certiorari* solicitando la revisión de dicha resolución.

En su Petición de Certiorari, pág. 7, los recurrentes señalaron la siguiente cuestión:

> Erró el Honorable Tribunal de Circuito de Apelaciones al acoger los incorrectos fundamentos expuestos por el honorable Tribunal de Primera Instancia para Expedir un injunction decretando la invalidez de una acción administrativa emitida hace aproximadamente ocho (8) años, sin que se cumpliera con las exigencias legales para sostener la procedencia del mismo.

Tras expedir mandamiento de certiorari mediante resolución de 9 de abril de 1999, resolvemos que erró el Tribunal de Circuito de Apelaciones al denegar la expedición de *certiorari, y* confirmar así al tribunal de instancia. El *injunction* preliminar emitido por el Tribunal de Primera Instancia no es procedente. Por tanto, revocamos. Ordenamos, además, la desestimación de la acción presentada por los recurridos.

A la luz del derecho estatutario y reglamentario vigente aplicable a la Administración de Corrección, ordenamos a la agencia dar *entero e inmediato cumplimiento* a la Sección XIII de reglamento (Núm. 4901) titulado *Procedimiento para el Traslado de Sentenciados o de Confinados Sentenciados a Instituciones Penales de los Estados Unidos* de 31 de enero de 1993 sin que para ello sea necesario trasladar al recurrido a esta jurisdicción con antelación. El requerimiento de este Tribunal debe ejecutarse inmediatamente, una vez nuestro dictamen advenga final y firme.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río emite Opinión de Conformidad a la cual se unen los Jueces

Asociados señor Rebollo López y Rivera Pérez. El Juez Presidente señor Andréu García y la Juez Asociada señora Naveira de Rodón concurren sin opinión escrita. Los Jueces Asociados señores Hernández Denton y Fuster Berlingeri disienten con opinión escrita.


                              Isabel Llompart Zeno
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Plácido Serrano Vélez;
Angélica Vélez Torres

       Demandantes-Recurridos

          v.

Estado Libre Asociado de        CC-1998-1006
Puerto Rico; Departamento
de Corrección y Rehabilitación;
Nydia Cotto Vives, Secretaria;
Administración de Corrección,
Zoe Laboy, Administradora

       Demandados-Recurrentes

      Opinión de Conformidad emitida por el Juez Asociado señor Corrada del Río, a la cual se unen los Jueces Asociados señores Rebollo López y Rivera Pérez

San Juan, Puerto Rico, a 18 de junio de 2001.

I

El confinado Plácido Serrano Vélez (en adelante, el recurrido) se encuentra recluido en prisión desde el año 1977, cumpliendo varias sentencias por distintos cargos criminales en su contra. La mayoría de los delitos cometidos por el recurrido son graves, incluyendo, entre otros, un cargo de asesinato en primer grado en grado de reincidencia, dos (2) cargos de asesinato en segundo grado, tres (3) cargos del delito de fuga, apropiación ilegal agravada, amenaza y varias violaciones tanto a la Ley de          Sustancias          Controladas          como          a          la          Ley

de Armas.[1] Por la gravedad de sus delitos, el recurrido se encuentra extinguiendo penas que suman 204 años de prisión. El recurrido no ha impugnado ni cuestionado ninguna de estas sentencias.

El 29 de agosto de 1990 el recurrido fue trasladado del Centro de Detención Regional de Guayama a la Institución Regional del Oeste en Mayagüez. El traslado se efectuó a raíz de una confidencia en la cual se informaba los planes de fuga de un grupo de reos de la cárcel de Guayama. Se informó además que el recurrido encabezaba el grupo que intentaría fugarse. Se encontró que había una ventana rota y un hueco preparado para la fuga en el lugar de la institución de Guayama donde se encontraba el grupo. Además, el grupo de reos encabezado por el recurrido fue participe de un paro en la cárcel de Guayama.

Posteriormente, a mediados del mes de diciembre de 1990, la Srta. Nancy I. Boneta López, entonces Directora del Negociado de Instituciones Penales de la Administración de Corrección recibió una carta enviada por el Sr. Ángel R. Guerra Sánchez, entonces Superintendente IV en el Centro de Detención del Oeste de Mayagüez, en donde se encontraba recluido el recurrido.[2] La Dra. Mercedes Otero de Ramos, entonces Administradora de Corrección, recibió copia de dicha carta.[3]

En la carta, de 10 de diciembre de 1990, el Sr. Guerra Sánchez indicó que en la Sección de Máxima Protectiva tenía ubicados a catorce confinados de Máxima Seguridad los cuales se habían fugado anteriormente de la Institución Regional de Guayama. Indicó que este grupo había encabezado una revuelta para alterar el orden y la seguridad institucional de la cárcel de Guayama, y que había recibido confidencias fehacientes advirtiendo que el grupo estaba planificando tomar rehenes para así lograr salir de la

---

[1] Las sentencias dictadas en su contra son las siguientes: (a-c) 7 de marzo de 1977, Criminal Núm. G76-4163 robo, G76-4165 y M76-2607 por infracciones a los arts. 6 y 32 de la Ley de Armas; (d) 18 de marzo de 1977, Criminal Núm. G76-1762 apropiación ilegal agravada; (e-i) 8 de septiembre de 1978, Criminal Núm. G76-133 asesinato en segundo grado, G76-876 robo, M75-826 y G76-131 infracciones a los arts. 6 y 8 de la Ley de Armas, G76-135 asesinato en segundo grado; (j) 18 de noviembre de 1978, Criminal Núm. G82-79 asesinato en primer grado en grado de reincidencia; (k) 1 de octubre de 1984, Criminal Núm. 84-454 fuga; (l-p) 2 de mayo de 1988, Criminal Núm. M88-269, G-88-456, G88-454, G88-455 por infracciones a los arts. 6, 8 (a), 8 y 5 de la Ley de Armas y G88-457 infracción al art. 404 de la Ley de Sustancias Controladas; (q) 23 de mayo de 1988, Criminal Núm. 889-430 amenaza; (r) 22 de junio de 1988, Criminal Núm. G88-376 fuga; (s) 13 de octubre de 1988, Criminal Núm. G88-800 fuga; (t-v) 17 de noviembre de 1988, Criminal Núm. KLA88G414, 415 infracción al art. 5 de la Ley de Armas, KSC88G0273 infracción al art. 404 de la Ley de Sustancias Controladas, KLA88M0203; (w, x, y, z) 6 de diciembre de 1988, Criminal Núm. M88-443, M88-445 infracciones al art. 6 de la Ley de Armas, Criminal G88-891 y G88-892, violación al art. 8 de la Ley de Armas; y (aa) 12 de mayo de 1989, Criminal Núm. G89-269 daños menos grave. Véase Estipulación de Hecho Núm. 1, Exhibit III.
[2] Exhibit V, Apéndice, pág. 61.

[3] *Id.*, pág. 62.

Institución. Explicó además que el grupo estaba amenazando que si fracasaba en su intento de

de

negociación con la Administración de Corrección, provocaría que los reclusos arrancasen los tubos de las barandas del segundo y tercer nivel para con ellos romper los cristales del "Control Room" y así lograr apoderarse de todo el edificio. Indicó también que el grupo intentaría masacrar a los confinados del bando contrario que se encontraban ubicados en la Sección de Máxima-Máxima. Finalmente, entendía el Sr. Guerra Sánchez que dada las características de esos confinados no tenía dudas de que el grupo intentaría hacer lo que había planificado para lograr sus propósitos. Surge del récord que el Sr. Guerra Sánchez le había informado de todo esto al Capitán Regional, Sr. Luis Álvarez Galván; al Sr. Willy Ortiz, Jefe de Seguridad; y al Sr. Carlos Velásquez Rodríguez, Administrador Auxiliar.[4] Consecuentemente, ante este cuadro de emergencia, a la luz del expediente del recurrido, y el grave peligro que implicaba la situación, el 22 de diciembre de 1990 el recurrido fue trasladado a seguir cumpliendo su pena de reclusión en una institución correccional en los Estados Unidos. Tal acción se basó en un convenio establecido entre el Negociado Federal de Prisiones y la Administración de Corrección.[5]

Diez días más tarde, el 2 de enero de 1991, la Dra. Mercedes Otero de Ramos remitió una carta a la Sra. Angélica Vélez Torres (en adelante, la recurrida), progenitora del recurrido Serrano Vélez. Le informó sobre el traslado realizado, e indicó que se había efectuado al amparo de la Sección X(4) del Reglamento denominado *Procedimiento para el Traslado de Sentenciados o de Confinados Sentenciados a Instituciones Penales en Estados Unidos*. Además, le expresó que de acuerdo a la información recogida y el análisis del expediente del confinado Serrano Vélez era forzoso concluir que la permanencia de éste en el sistema penal de Puerto Rico representaba un grave riesgo a la seguridad de confinados, empleados, y a la sociedad en general. Le indicó también que tenía la expectativa de que esta nueva experiencia le permitiría a su hijo modificar su peligrosa y temeraria conducta.[6]

En el 1993, la recurrida, Sra. Vélez Torres, le dirigió una carta al Gobernador de Puerto Rico para que, entre otras cosas, la ayudase con "su problema", ya que su "deseo de madre atribulada" era "ver a su hijo en la calle".[7] Posteriormente, el 16 de junio

---

[4] *Id.*, pág. 61.

[5] Estipulación de Hechos, Exhibit III, Apéndice, pág. 25.

[6] Actualmente el recurrido Serrano Vélez permanece confinado en la Penitenciaria Estatal de Beaumont, Texas, cumpliendo sentencia en un nivel de custodia "High In", según se desprende de un Informe Preparado por dicha institución. Se desprende además de dicho informe de progreso que el referido confinado varias veces ha violado las normas de conducta de la institución, inclusive, por posesión de sustancias narcóticas. *Véase* Estipulación de Hechos, Exhibit III, Apéndice, pág. 25; *véase además* Exhibit Núm. 8 anejado a "Moción Solicitando Reconsideración" (presentada ante este Tribunal el 9 de abril de 1999) denominado "Progress Report" del U.S. Department of Justice, Federal Bureau of Prisons de 10 de abril de 1998 sobre Plácido Serrano Vélez.

[7] Exhibit X, Apéndice, pág. 87-93.

de 1997, el representante legal de los recurridos envió una carta al Secretario de Justicia alegando por primera vez que el traslado del confinado Serrano Vélez a los Estados Unidos fue ilegal. Solicitó, por tanto, que lo regresasen a Puerto Rico dentro de diez (10) días.[8]

El 6 de agosto de 1997, casi siete (7) años después del traslado, los recurridos presentaron en el Tribunal de Primera Instancia una demanda al amparo de la sección 1983 de la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983;[9] los artículos 1802 y 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 5141 y 5142; el Art. 1 de la Ley Núm. 12 de 8 de agosto de 1974, 32 L.P.R.A. sec. 3524; y el Art.2(a) de la Ley de Reclamaciones y Demandas Contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. secs. 3077(a) (en adelante, Ley Núm. 104).[10] En esencia, los recurridos alegan que la Administración de Corrección trasladó arbitraria y caprichosamente al confinado Serrano Vélez a una institución correccional en los Estados Unidos sin darle las garantías mínimas del debido proceso de ley. Los recurridos solicitaron en su demanda que se declarase ilegal el traslado y que se ordenase su regreso a la jurisdicción de Puerto Rico.

El 29 de octubre de 1998 el TPI dictó sentencia parcial librando auto de *injunction* que dejó sin efecto la orden de traslado del confinado de 22 de diciembre de 1990. Además, el TPI ordenó a la Administración de Corrección a efectuar las gestiones correspondientes para adquirir la custodia del recurrido Serrano Vélez y regresarlo a Puerto Rico. De esa determinación parcial recurrieron ante el TCA los aquí recurrentes, la Administración de Corrección, la Secretaria de Corrección y Rehabilitación y el Estado Libre Asociado (en adelante, los recurrentes). El 23 de noviembre de 1998 el TCA emitió una resolución acogiendo los fundamentos de derecho expuestos por el TPI, denegando así la expedición del auto de *certiorari* solicitado y la moción en auxilio de jurisdicción. El 15 de diciembre de 1998 los recurrentes presentaron ante este Tribunal una Petición de *Certiorari* solicitando la revisión de dicha resolución.[11] El 9 de abril de 1999, mediante

---

[8] Exhibit VII, Apéndice, pág. 64.

[9] La Sec. 1983 dispone en lo pertinente:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Colombia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[10] Exhibit VIII, Apéndice, pág. 68.

[11] En su Petición de Certiorari, pág. 7, los recurrentes señalaron la siguiente cuestión:
> Erró el Honorable Tribunal de Circuito de Apelaciones al acoger los incorrectos fundamentos expuestos por el honorable Tribunal de Primera Instancia para Expedir un injunction

resolución, expedimos mandamiento de *certiorari*. Las partes han comparecido exponiendo sus respectivas posiciones.

II

Examinaremos primeramente el reclamo de la Sra. Vélez Torres, particularmente en cuanto a su causa de acción bajo la Ley de Derechos Civiles federal, 42 U.S.C. 1983.

En la carta enviada al Secretario de Justicia el 16 de junio de 1997, y luego en la demanda presentada ante el TPI el 7 de agosto de 1997, ella alegó que el traslado del confinado Serrano Vélez a los Estados Unidos fue un acto ilegal e inconstitucional del Gobierno que tuvo el efecto de "castigar a su familia". Adujo además que su "derecho de visita" y el "derecho" de sus familiares de "relacionarse con el confinado" se ha afectado severamente debido a que le es imposible visitarlo en los Estados Unidos. Alegó también que el hecho de ser "privada por seis años con ocho meses de la relación humana y necesaria" con el confinado constituye un castigo cruel e inusitado en su contra. Por estas razones concluye que la parte demandada, recurrente ante nos, debe indemnizarla con un total de cien mil dólares ($100,000).

La recurrida no tiene una causa de acción válida bajo la Ley de Derechos Civiles federal, 42 U.S.C. 1983, puesto que de los hechos no surge que los recurrentes le hayan violado sus *derechos constitucionales*. "La sec. 1983 de la Ley federal de Derechos Civiles, *supra*, es un vehículo para que los ciudadanos puedan hacer valer los derechos que confieren la Constitución y las leyes de Estados Unidos frente a aquellas personas que abusan de su poder cuando actúan so color de autoridad estatal". *Leyva* et al *v. Aristud* et al, 132 D.P.R. 489, 500 (1993). En todo caso, *fue a su hijo* a quien los recurrentes trasladaron a los Estados Unidos.

Conocida es la norma de que los derechos reclamados bajo la sec. 1983 no pueden ser reclamados por terceros sino por la persona a quién el Estado le violó sus derechos constitucionales. *Warth v. Selding*, 422 U.S. 490 (1975); *Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997); *Pittsley v. Warish*, 927 F.2d 3 (1st Cir. 1991); *Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990); *Valdivieso Ortíz v. Burgos*, 807 F.2d 6 (1st Cir. 1986). Además, la regla general prevaleciente tanto en Puerto Rico como en Estados Unidos es que las partes "tienen capacidad tan solo para plantear sus propios derechos

decretando la invalidez de una acción administrativa emitida hace aproximadamente ocho (8) años, sin que se cumpliera con las exigencias legales para sostener la procedencia del mismo.

contra actos alegadamente ilegales del gobierno". *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 396 (1983); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975); *Warth v. Seldin*, *supra*. La facultad de invocar la protección de un derecho constitucional, como regla general, le pertenece solamente a su acreedor. *Zachry International v. Tribunal Superior*, *supra*. Para un análisis sobre la excepción a esta regla general y los factores a considerar, véase *E.L.A. v. P.R. Tel. Co., supra*, pág. 397.

Asimismo, habiendo también examinado el argumento constitucional de la Sra. Vélez Torres de que el traslado de su hijo a los Estados Unidos constituye un castigo cruel e inusitado tanto *en contra de ella* como *en contra de toda su familia*, entendemos que éste no es procedente. El castigo cruel e inusitado, quien lo sufre y quien lo puede invocar, es el confinado. Sabido es que ese tipo de planteamiento constitucional presupone la convicción criminal del ciudadano que lo plantea y la subsiguiente imposición de una pena. *Véase Bell v. Wolfish*, 441 U.S. 520, 535, y texto en la nota al calce núm. 16 (1979); *véase además Brunet Justiniano v. Gobernador*, 130 D.P.R. 248 (1992) y casos allí citados; *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991); *Pueblo v. Pérez Méndez*, 83 D.P.R. 228 (1961). Por tanto, este reclamo de la recurrida Vélez Torres carece de mérito.

Finalmente debemos señalar que en la jurisdicción federal nunca se ha reconocido un "derecho" constitucional a visitar a los confinados o un "derecho" de relacionarse con los confinados, sean familiares o no, ni tampoco existe causa de acción alguna que le apareje. Las visitas a los confinados en las instituciones correccionales federales son consideradas "privilegios". Así pues en la mayoría de los casos se ha resuelto que el gobierno federal no tiene obligación constitucional alguna de garantizar que las visitas a los confinados o las relaciones familiares de estos sean dables. *Véase Mayo v. Lane*, 867 F.2d 374, 375-76 (7mo Cir. 1989); *Thorne v. Jones*, 765 F.2d 1270, 1273-74 (5to Cir. 1985); *Young v. Vaughn*, 2000 WL 10564444 (E.D.Pa. 08/01/2000); *Chase v. Ward*, 2000 WL 572711 (E.D.Pa. 05/10/2000); *Africa v. Vaughn*, 1996 WL 65445, pág.1 (E.D.PA. 14/02/96); *Walters v. United States*, 1995 WL 144657, pág. 1 (E.D.Pa. 03/14/95); *Buehl v. Lehman*, 802 F.Supp. 1266, 1270 (E.D.PA. 1992); *Flanagan v. Shively*, 783 F.Supp. 922, 934 (M.D.Pa. 1992), *confirmado*, 980 F.2d 722 (3er Cir. 1992),

*cert. denegado*, 510 U.S. 829 (1993); *White v. Keller*, 438 F.Supp. 110, 438 F.Supp. 110, 114 (D.Md. 1977), confirmado, 588 F.2d 913 (4to Cir. 1978).

El presente caso, sin embargo, no es el apropiado para resolver dicha cuestión en nuestra jurisdicción. Independientemente de si las visitas a los confinados en nuestra jurisdicción es un privilegio o un derecho, entendemos que, en el caso de autos, la recurrida Vélez Torres no tiene causa de acción bajo la Ley de Derechos Civiles federal por razón de la conducta de su hijo en el penal que dio lugar a su traslado fuera de Puerto Rico según discutimos anteriormente.

III

Debemos examinar la procedencia del reclamo de la recurrente al amparo de la Ley Núm. 104, *supra*.

En Puerto Rico existe lo que se ha denominado como una "dualidad de remedios", mediante la cual una persona puede reclamar por daños en contra del Estado al amparo de la Ley de Derechos Civiles federal (42 U.S.C. sec. 1983) o bajo el Art. 1802 del Código Civil, o ambos. *Leyva* et al *v. Aristud* et al, *supra*, pág. 508. Indiscutiblemente, hemos resuelto que la causa de acción bajo la Ley de Derechos Civiles federal y la acción al amparo de la doctrina de responsabilidad extracontractual del Art. 1802 del Código Civil no son acciones mutuamente excluyentes. *Id.*

Reiteradamente hemos resuelto, además, que el Estado Libre Asociado de Puerto Rico responderá por los daños ocasionados por los actos negligentes de sus funcionarios, bajo la doctrina de responsabilidad extracontractual del Artículo 1802 del Código Civil, 31 L.P.R.A. 5141. *García* et als. v. *E.L.A.*, 146 D.P.R. __ (1998), res. el 13 de octubre de 1998, 98 T.S.P.R. 131, 98 J.T.S. 133; *Leyva* et al *v. Aristud* et al, *supra*; *Defendini Collazo* et al *v. E.L.A., Cotto*, 134 D.P.R. 28 (1993); *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740 (1992); *Ramos v. Hosp. Sub-Regional de Aguadilla*, 111 D.P.R. 744 (1981); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, 181 (1979). De hecho, fue mediante la Ley Núm. 104, *supra*, que el E.L.A. dio su consentimiento para ser demandado, *inter alia*, por aquellas causas de acción que estén basadas en la Constitución, las leyes y los reglamentos.

La Ley Núm. 104, *supra*, sigue esencialmente el esquema de la doctrina de responsabilidad extracontractual del Art. 1802 del Código Civil, *supra*. *Leyva* et al *v. Aristud* et al, *supra*, págs. 508-509; *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991).[12] Es

---

[12] Específicamente, el Artículo 6 de la Ley Núm. 104 autoriza las "acciones por *daños y perjuicios* a la persona o a la propiedad" en contra del E.L.A. causados por "*acto* u *omisión*" de sus agentes. 32 L.P.R.A. sec. 3081.

decir, que las personas que presentan reclamaciones judiciales por daños y perjuicios en contra del E.L.A. bajo este estatuto deben siempre alegar y probar los tres factores trillados del Art. 1802; a saber, 1) la presencia de un daño real; 2) la relación entre la acción u omisión y el daño (también denominado como el requisito de "causalidad", "nexo causal" o "causa adecuada"); y 3) que el acto u omisión de la persona fue negligente.[13]

Sin embargo, bajo el esquema de la Ley Núm. 104, *supra*, un reclamante tiene que probar la concurrencia de tres factores *adicionales*: 1) que la persona que causó daño era agente, funcionario o empleado del Estado y que estaba actuando en su capacidad *oficial* al momento de causarlo; 2) que dicha persona actuó dentro del marco de sus funciones oficiales; 3) que su actuación fue negligente, y *no intencional*. *Leyva* et al *v. Aristud* et al, *supra*, pág. 510.[14] La integración de la doctrina de responsabilidad extracontractual al esquema regulador de la Ley Núm. 104 responde a que el precepto de responsabilidad por culpa o negligencia del Art. 1802 del Código civil "constituye una

---

[13] El Artículo 1802 del Código Civil en lo pertinente dispone: "El que por acción u omisión causa daño a otro, interviniendo **culpa o negligencia**, está obligado a reparar el daño causado". 31 L.P.R.A. sec. 5141 (énfasis añadido).

**continúa...**

[13] **...continuación**

"[E]l concepto de **culpa** del aludido Art. 1802 del Código Civil incluye, (1) actos delictuales, incluyendo los llamados *torts* intencionales de la *Common Law*, (2) los actos y omisiones intencionales no penados por ley, (3) conducta dolosa y (4) cualesquiera otros actos intencionales". Herminio M. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en P.R..*, pág. 7, Publicaciones JTS, Inc. (2ª ed., 1986). Sin embargo, notamos que "[a]unque existen inidentificables diferencias conceptuales entre las figuras jurídicas de **culpa** y **negligencia**, nuestra jurisprudencia tiende a integrar éstas en una sola . . . . Por tanto, no hay diferencia entre que el demandado incurra en **culpa** o en **negligencia**. . . . No obstante, en ciertos casos, . . . los tribunales se ven forzados a distinguir los conceptos de **culpa** y de **negligencia**". *Id.*

Es importante apuntar, sin embargo, que a tenor con el Art. 6 de la Ley Núm. 104, *supra*, el E.L.A. no responde por los actos *intencionales* de sus agentes. *Leyva* et al *v. Aristud* et al, *supra*, pág. 508.

[14] "Cumplidos estos requisitos, el E.L.A. está sujeto a responsabilidad en cualquiera de los supuestos siguientes: (1) cuando el empleado, agente o funcionario causa un daño *por su exclusiva culpa o negligencia* mientras desempeña sus funciones y actúa en su capacidad oficial; (2) cuando el empleado, agente o funcionario causa un daño mientras desempeña sus funciones y actúa en su capacidad oficial por una actuación preponderantemente negligente, aún cuando dicha conducta tenga algunos elementos intencionales; (3) cuando, a pesar de que el daño fue directamente producido por un acto enteramente

**continúa...**

[14] **...continuación**

*intencional* de los cuales no responde el Estado, hubo otros *actos negligentes separados* de cocausantes del daño por los cuales sí debe responder el Estado, y (4) *cuando el Estado a través de sus agentes es negligente* por omisión al incumplir con un deber impuesto por las leyes y la Constitución". *Leyva* et al *v. Aristud* et al, *supra*, pág. 510-11.

norma *general* para la reparación de *todo daño ilícito*, incluso cuando la actuación dañina contraviene intereses o derechos garantizados por la Constitución o por legislación protectiva  de derechos civiles". *Bonilla v. Chardón*, 118 D.P.R. 599, 611 (1987)(cita interna omitida; bastardillas suplidas); *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970); *Muriel v. Suazo*, 72 D.P.R. 370, 376 (1951).[15] Debemos examinar pues si bajo el esquema de la antedicha Ley procede la acción de la Sra. Vélez Torres.

Ciertamente al interpretar en el pasado el Art. 1802, *supra*, hemos reconocido que el sufrimiento que experimentan los padres por la pérdida de un hijo es "un proceso psíquico inevitable en todo ser humano normal". *Moa v. E.L.A.*, 100 D.P.R. 573, 582 (1972). De hecho, hemos indicado que el sufrimiento a consecuencia de la pérdida de un hijo es una realidad humana "de reconocimiento común y general, notorio e indisputable" y que, por lo tanto, "es o debe ser de conocimiento judicial, aun cuando no se ofrezca evidencia alguna alefecto". *Id.* Consecuentemente, —asumiendo *arguendo* que en el caso de autos la Sra. Vélez Torres ha "perdido" a su hijo— es completamente normal y natural que la recurrida alegue sentir profunda angustia por la situación que vive y por el hecho de que sus lazos familiares se hayan visto seriamente perjudicados. En ese sentido, no es necesario que la recurrida ofrezca prueba alguna del sufrimiento y la angustia que pueda estar experimentando; de ello podemos tomar conocimiento judicial. El dolor que siente una madre por un hijo confinado puede ser sin duda insondable.

Ahora bien, ese hecho por sí solo no es suficiente para que aceptemos la contención de la recurrida de que la causa adecuada de su congoja se deba a los supuestos actos ilegales de la parte recurrente. En el caso de autos sencillamente no existe un nexo causal entre el alegado sufrimiento de la Sra. Vélez Torres y los supuestos actos de la parte recurrente. La razón por la cual se troncharon los lazos familiares entre la recurrida y su hijo es la vida delictiva de éste y las consecuencias perniciosas de su temeraria conducta dentro y fuera del penal.[16] Por esta razón, el reclamo de la Sra. Vélez Torres carece de méritos.

Si bien es cierto que la Ley Núm. 104 reconoce una causa de acción en contra de empleados, funcionarios o agentes del E.L.A. por daños que causaren negligentemente, el Art. 6(b) del estatuto excluye escuetamente de responsabilidad a dichos funcionarios

---

[15] Asimismo, nada impide que al amparo del Art. 1802 del Código Civil se pueda reclamar por una violación a la doctrina del debido procedimiento de ley garantizado por las leyes federales y estatales, ya que el concepto de culpa es tan infinitamente amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o daño. *Bonilla v. Chardón*, *supra*, pág. 611.

cuando el acto torticero ocurre en el desempeño de sus funciones discrecionales.[17] *Véase* 32 L.P.R.A. sec. 3081(b); *Piñeiro Manzano v. E.L.A.*, 102 D.P.R. 795 (1974); *véase además Aponte* et al *v. Alcalde de San Lorenzo*, 146 D.P.R. __, res. el 16 de septiembre de 1998, 98 T.S.P.R. 122, 98 J.T.S. 123, pág. 104. La determinación de lo que es una "función discrecional" requiere la aplicación del método casuístico (*i.e.*, caso a caso), es decir, de acuerdo con las circunstancias particulares de cada caso. *Piñeiro Manzano v. E.L.A.*, *supra*, pág. 799. Y "[e]ste análisis debe ser realizado teniendo en mente que la actividad gubernamental diversas clases de actuaciones discrecionales. . . . [que] incluye desde la formulación de programas y normas básicas de política pública, a distintos niveles de gobierno, hasta el ejercicio de discreción limitado y rutinario". *Aponte* et al *v. Alcalde de San Lorenzo*, *supra*, pág. 104. El traslado del recurrido a los Estados Unidos fue una determinación enteramente discrecional de la Administración de Corrección, siendo ello una razón adicional por la cual procede desestimar la acción presentada por la recurrida.

IV

El recurrido Serrano Vélez alegó que su traslado a los Estados Unidos violó su derecho constitucional a un debido procedimiento de ley.[18] Los tribunales apelados

---

[16] *Véase Sanabria v. E.L.A.*, 132 D.P.R. 769, 773 (1993) donde resolvimos, *inter alia*, que fue debido a la conducta delictiva de un confinado que se troncharon sustancialmente los lazos familiares de éste.

[17] "Nada en esta ley autoriza las acciones por daños y perjuicios contra el Estado por acto u omisión de un funcionario, agente o empleado . . . (b) en el desempeño de una función de carácter discrecional, **aun cuando hubiere abuso de discreción.** 32 L.P.R.A. sec. 3081(b)(énfasis suplido).

[18] **Como señalamos anteriormente, el recurrido instó en el TPI una acción al amparo de la sección 1983 de la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983. Como también indicamos, la sec. 1983 de la Ley federal de Derechos Civiles es un instrumento para que los ciudadanos estadounidenses puedan hacer valer los derechos que confieren la Constitución y las leyes federales frente a aquellas personas que so color de autoridad pública cometen actos constitutivos de abuso del poder. Para que un demandante pueda prevalecer en una acción bajo este estatuto debe demostrar, (1) que el demandado actuó so color de autoridad, y (2) que esta actuación lo privó de los derechos garantizados por la Constitución y las leyes de Estados Unidos. *Leyva* et al *v. Aristud* et al, *supra*, pág. 501, y casos allí citados. *Leyva* et al *v. Aristud* et al, *supra*, pág. 500. Sin embargo, la acción del recurrido no es procedente al amparo de este estatuto federal.**

**Primeramente, nuestra jurisprudencia ha determinado que los Tribunales de Puerto Rico tienen jurisdicción concurrente con las cortes federales para juzgar los litigios surgidos al amparo de la sec. 1983. *Leyva* et al**

continúa...

resolvieron que su reclamo era procedente al amparo de las disposiciones sobre adjudicaciones formales de LPAU.[19] En vista de que la doctrina del debido procedimiento de ley no proscribe la actuación de la Administración de Corrección –esto es, en ausencia de reglamentación aplicable al momento del traslado– y en vista, además, de que LPAU no es aplicable a la situación de autos, entendemos que procede revocar.

Este reclamo del recurrido Serrano Vélez suscita una cuestión sobre la cuál este Tribunal nunca se ha expresado concretamente. Resulta pues importante examinar el ámbito y la extensión de la protección constitucional conferida a los ciudadanos confinados bajo la doctrina del debido proceso de ley.

---

[18] ...continuación

*v. Aristud* et al, *supra*, pág. 499; *Ramos González v. Félix Medina*, 121 D.P.R. 312, 332 (1988); *Bonilla v. Chardón*, 118 D.P.R. 599, 608 (1987); *Acevedo v. Srio. Servivios Sociales*, 112 D.P.R. 256, 608 (1987).

No obstante, en *Leyva* et al *v. Aristud* et al, *supra*, subrayamos que una acción estatal como la de autos al amparo de la sec. 1983 no es procedente contra los Estados –que para estos propósitos *incluye* al E.L.A.– ya que "[l]os Estados no son considerados 'personas' al amparo de la sec. 1983 de la Ley federal de Derechos Civiles, y no procede demandar en su contra según este estatuto". *Leyva* et al *v. Aristud* et al, *supra*, pág. 516, y casos allí citados. Igualmente, resolvimos que tampoco procede una acción bajo dicha ley en contra de un funcionario estatal que es demandado *en su carácter oficial*. *Id.* Por lo tanto, es forzoso concluir que en el caso de autos la reclamación en contra del E.L.A. bajo la sec. 1983 no es procedente. Además, a tenor con lo resuelto en *Leyva* et al *v. Aristud* et al, *supra*, las recurrentes (entiéndase, Nydia Cotto Vives, Secretaria del Departamento de Corrección, y Zoe Laboy, Administradora de Corrección) no podían ser demandadas en su *carácter oficial* bajo dicho estatuto federal. *García* et als. v. *E.L.A.*, 146 D.P.R. __ (1998), res. el 13 de octubre de 1998, 98 T.S.P.R. 131, 98 *J.T.S.* 133. Es decir, las recurrentes sólo podían ser demandadas en su carácter *personal* al amparo de la sec. 1983 y conforme a su jurisprudencia interpretativa. Sin embargo, nos vemos forzados a desestimar la causa de acción del recurrido al amparo de dicha sección ya que surge de la demanda que las recurrentes fueron demandadas en su carácter oficial. *Véase* Demanda, Exhibit VIII, Apéndice pág. 70, párrafo 6 y 8.

[19] Véase 3 L.P.R.A. secs. 2151–2177.

La fuente en Puerto Rico del derecho constitucional al debido proceso de ley emana de la Decimocuarta Enmienda de la Constitución de los Estados Unidos[20] y el Artículo II, Sección 7 de la Constitución de Puerto Rico.[21] *Maldonado Elías v. González Rivera*, 118 D.P.R. 260, 273 (1987)(voto particular del Juez Asociado señor Hernández Denton).

El debido proceso de ley tiene dos vertientes: la sustantiva y la procesal. *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987). El debido proceso de ley *procesal* "toma en cuenta las garantías procesales mínimas que el Estado debe proveerle a un individuo al afectarle su vida, propiedad o libertad". *Id.*, pág. 273. Al analizar un reclamo constitucional bajo el debido proceso de ley en su aplicabilidad procesal se hace necesario, primero, determinar si el reclamante tiene un interés individual de vida, libertad o propiedad que deba ser protegido. *Sadin v. Conner*, 515 U.S. 472 (1995); *Board of Regents v. Roth*, 408 U.S. 564 (1972). Luego, una vez cumplida esta determinación inicial, procede entonces determinar cuál es el procedimiento exigido (*what process is due*). *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562, 578 (1992); *Rivera Santiago v. Srio. de Hacienda*, *supra*, pág. 274.

El primer paso, determinar si el reclamante tiene un interés reconocido por la comunidad como constitucionalmente protegido, *es fundamental*. El Profesor Demetrio Fernández en su tratado de Derecho Administrativo explica el análisis que los tribunales deben seguir ante un re**clamo de debido proceso de ley procesal**:

> La primera cuestión, si se requiere algún tipo de debido proceso de ley, es la básica. **De contestarse en la negativa se hace absolutamente innecesario pasar a examinar y considerar las otras . . . cuestiones.** En el presente contexto sólo puede contestarse en la afirmativa si la actuación del organismo administrativo interviene con los intereses propietarios y libertarios del individuo. D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme* 131 (1993).

Siguiendo este esquema, examinemos primeramente el ámbito y la extensión de los intereses libertarios que se le reconocen a los confinados bajo el debido proceso de ley. Esto es, si el confinado Serrano Vélez es acreedor de algún interés libertario que requiera ser protegido constitucionalmente. De contestarse en la negativa será entonces innecesario pasar a examinar si el procedimiento de traslado seguido por los recurrentes

---

[20] La Sección 1 de la Decimocuarta Enmienda de la Constitución de los Estados Unidos dispone lo siguiente: "Toda persona nacida o naturalizada en los Estados Unidos y sujeta a su jurisdicción, será ciudadana de los Estados Unidos y del estado en que resida. Ningún estado aprobará o hará cumplir ninguna ley que restrinja los privilegios o inmunidades de los ciudadanos de los Estados Unidos; ni ningún estado privará a persona alguna de su vida, de su libertad o de su propiedad, sin el debido procedimiento de ley, ni negará a nadie, dentro de su jurisdicción, la igual protección de las leyes". 1 L.P.R.A. Emda. Art. XIV, pág. 193 (1999).

[21] El Art. II, Sec. 7 de la Constitución de Puerto Rico dispone en lo pertinente que: "Ninguna persona será privada de su libertad o propiedad

cumplió con la LPAU. D. Fernández, *Derecho Administrativo*, *supra*, pág. 313. Además, de entrada es importante apuntar que "[e]n nuestra jurisdicción el desarrollo de la doctrina [del debido proceso de ley] ha sido similar al de Estados Unidos". *Maldonado Elías v. González Rivera*, *supra*. Por tal razón es propio examinar el desarrollo de la casuística estadounidense más importante sobre este asunto.

En el 1947 el Tribunal Supremo de los Estados Unidos estableció una norma de protección constitucional un tanto limitada para los confinados bajo el debido proceso de ley al expresar que "el encarcelamiento legal trae consigo la necesaria retractación o la limitación de muchos privilegios y derechos, justificada por razones de fundamental importancia para nuestro sistema penal". *Price v. Johnston*, 334 U.S. 266, 285 (1947)(traducción

suplida).[22]

Posteriormente, en el caso de *Wolff v. McDonnell*, 418 U.S. 539 (1974) esa Curia por voz del Juez White expresó lo siguiente:

> Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a retraction justified **by the considerations underlying our penal system**. But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country. *Id.*, págs. 555-56 (énfasis suplido; citas internas y comillas omitidas).

Luego, en *Hudson v. Palmer*, 468 U.S. 517 (1983), el Tribunal Supremo federal expresó que los confinados son acreedores de aquellos derechos que no sean "fundamentalmente inconsistentes con el encarcelamiento o incompatible con los objetivos penológicos de la reclusión". *Id.*, pág. 523 (traducción suplida).[23] No obstante, en *Hudson* el Tribunal reiteró la norma firmemente establecida en *Price* y *Wolf* de protección constitucional más limitada para los confinados bajo la doctrina del debido proceso de ley, y a su vez abundó sobre la importancia del propósito de dicha norma:

> However, while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumstances or loss of many significant rights. These constraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system. **The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security.** Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction. *Hudson v. Palmer*, *supra*, pág. 524 (énfasis suplido; citas y comillas internas omitidas).

---

sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes".

[22] "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system". *Price v. Johnston*, 334 U.S. 266 (1947).

En resumen, la norma establecida sobre la extensión de la protección constitucional conferida a los ciudadanos confinados bajo el debido proceso de ley es la siguiente: si bien ellos son acreedores de muchas de las protecciones constitucionales,[24] no hay duda de que el encarcelamiento legal y legítimo de un ciudadano lleva consigo la desafortunada pérdida de su libertad física y, además, la reducción significativa de muchos de sus derechos civiles y constitucionales. *Véase Prisoner's Rights*, 88 Georgetown Law Journal 1715 (2000); y Michael F. Williams et al, *Substantive Rights Retained by F.* 88 Georgetown Law Journal 1716 (2000).[25]

Ahora bien, debemos examinar específicamente si el debido proceso de ley proscribe de algún modo el traslado de confinados a la luz de los principios esbozados. Advertimos que son varios los casos en que un confinado ha reclamado la protección del debido proceso de ley cuando ha sido trasladado de una institución correccional a otra. Véase, entre otros, *Sandin v. Conner*, 515 U.S. 472 (1995); *Olim v. Wakinekona*, 461 U.S. 238 (1982); *Vitek v. Jones*, 445 U.S. 480 (1980); *Montanye v. Haymer*, 427 U.S. 236 (1975); *Meachum v. Fano*, 427 U.S. 215 (1975).[26]

En los casos de *Meachum v. Fano*, *supra*, y *Montanye v. Haymer*, *supra*, el Tribunal Supremo de los Estados Unidos tuvo ocasión de resolver si el traslado de unos reos de

---

[23] "Indeed, we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with *the* objectives of incarceration". *Hudson v. Palmer*, *supra*, pág. 523.

[24] Nuevamente, los ciudadanos confinados retendrán aquellos derechos que sean compatibles con los objetivos penológicos de su reclusión. *Hudson v. Palmer*, *supra*, pág. 523. Así se ha resuelto que los reos han de retener, por ejemplo, el derecho fundamental de casarse, sujeto a aquellas limitaciones que naturalmente resulten de su confinamiento, *Turner v. Safley*, 482 U.S. 78, 89-97 (1987); el acceso al sistema judicial de los tribunales, *Bounds v. Smith*, 430 U.S. 817, 821 (1977); el derecho al debido procedimiento de ley, sujeto a las restricciones impuestas naturalmente por el sistema correccional, *Wolf v. McDonnell*, 418 U.S. 539; el derecho a la libertad de culto, *Cruz v. Beto*, 405 U.S. 319, 322, y texto en la nota al calce núm. 2 (1972); el derecho a la igual protección de las leyes, *Lee v. Washington*, 390 U.S. 333, 333-34 (1968); y, por definición, el derecho a estar protegido en contra de castigos crueles e inusitados, *Bell v. Wolfish*, 441 U.S. 520, 535, y texto en la nota al calce núm. 16 (1979). *Véase además Prisoner's Rights*, 88 Georgetown Law Journal 1715 (2000); y Michael F. Williams et al, *Substantive Rights Retained by Prisoners*, 88 Georgetown Law Journal 1716 (2000).

[25] "A detainee simply does not possess the full range of freedoms of an unincarcerated individual". *Bell v. Wolfish*, 441 U.S. 520, 546 (1978).

[26] De entrada, nos parece importante destacar que en cada uno de los casos donde este tipo de planteamiento se ha hecho el Tribunal Supremo federal ha sido enfático en rechazar una concepción general equivocada de que cualquier perjuicio que le cause el Estado a una persona da base suficiente, sin más, para invocar la protección del debido procedimiento de ley en su dimensión procesal. "We reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum*, *supra*, pág. 224.

una institución penal a otra *dentro de una misma jurisdicción estatal* afectaba directamente los derechos de éstos bajo el debido proceso de ley. Esa Curia resolvió que, en ausencia de prueba que indique la presencia de motivaciones estaduales constitucionalmente inválidas, la Constitución no proscribe el traslado de confinados de una institución penal a otra.

> [W]e cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.[27]

Además, expresó el Tribunal:

> The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison if, as is likely, the State has more than one correctional institution. The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. **The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.**[28]

Más adelante, en el mismo caso se expresa:

> That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.
> . . . .
>
> Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate. Yet under the approach urged here, any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome conditions that he had been experiencing. **We are unwilling to go so far.**
> . . . .
>
> . . . Whatever expectations the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections **as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.**
>
> Holding that arrangements like this are within the reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issue of discretionary decisions . . . .[29]

Subsiguientemente, muchos de los más altos tribunales de los Estados Unidos comenzaron a hacer aplicable el razonamiento de *Meachum* y *Montanye* no tan solo a

---

[27]  *Meachum v. Fano, supra*, pág. 224.

[28]  *Id.* (Negrillas suplidas).

[29]  *Id.*, págs. 225-29. (Negrillas suplidas).

traslados de confinados intraestatales sino también a traslados *interestatales*. Véase, *Goodnow v. Perrin*, 120 N.H. 669, 421 A.2d 1008 (1980); *In re Young*, 95 Wash.2d 216, 622 P.2d 373 (1980);; *Beshaw v. Fenton*, 635 F.2d 239 (3d Cir. 1980); *Cofone v. Manson*, 594 F.2d 934, n.4 (2d Cir. 1979); *Sisbarro v. Warden*, 592 F. 2d 1 (1st Cir. 1979); *Fletcher v. Warden*, 467 F.Supp. 777 (D. Kan. 1979); *Girouard v. Hogan*, 135 Vt. 448, 378 A.2d 105 (1977); *Curry-Bey v. Jackson*, 422 F.Supp. 926 (D.C. 1976); *McDonnell v. United States Attorney General*, 420 F.Supp. 217 (E.D. Ill. 1976).

Eventualmente, en *Olim v. Wakinekona*, *supra*, por primera vez el Tribunal Supremo de los Estados Unidos tuvo oportunidad de resolver una situación similar a la que hoy esta planteada ante nos. El Tribunal tuvo que resolver en *Olim* si el traslado de un confinado de una institución correccional de un estado (Hawaii) a una institución en otro estado (California) tuvo el efecto de infringir el derecho de "libertad" de un confinado, bajo la Decimocuarta Enmienda.[30] Al igual que lo habían acordado ya muchas cortes inferiores, el Tribunal Supremo federal extendió la norma de *Meachum* y *Montanye*, *supra*, y la hizo aplicable a traslados interestatales. El Tribunal razonó que "al igual que un confinado no tiene expectativa justificable de que será recluido en una institución correccional específica dentro de un Estado, tampoco puede tener expectativa justificable alguna de que será recluido dentro de un Estado específico". *Olim v. Wakinekona*, *supra*, pág. 245 (traducción suplida).[31] Además, se indicó que el hecho de que en numerosas jurisdicciones de los Estados Unidos se han aprobado leyes y no pocos acuerdos interestatales sobre este asunto es evidencia de que, en ocasiones, resulta necesario para el Estado trasladar a reos de cárceles de una jurisdicción a otras jurisdicciones. *Olim*, *supra*, pág. 246.

> In short, it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State. . . . **Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits.**[32]

En fin, el Tribunal Supremo de los Estados Unidos concluyó en *Olim* que el traslado interestatal de confinados, al igual que el intraestatal, "cae dentro de los límites aceptables de la custodia que adquiere el Estado sobre el convicto, luego de su convicción

---

[30] Es importante destacar, sin embargo, que en *Vitek v. Jones*, 445 U.S. 480 (1980), la Corte Suprema de E.U. resolvió –anterior al caso de *Olim*– que el traslado de un confinado de una institución correccional (*i.e.*, una cárcel) a un *manicomio* sí afectaba un interés de libertad del confinado, bajo la Constitución. No obstante, la Corte distinguió los casos.

[31] "Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State." *Olim*, *supra*, pág. 245.

[32] *Olim v. Wakinekona*, *supra*, pág. 247. (Negrillas suplidas).

criminal". *Olim v. Wakinekona*, *supra*, pág. 225, citando a *Meachum v. Fano*, *supra*, (traducción suplida).[33]

Por ultimo, en el caso de *Sandin v. Conner*, *supra*, el Tribunal Supremo federal se enfrentó nuevamente a la controversia relativa a los traslados de confinados. Luego de analizar detenidamente toda la jurisprudencia existente hasta ese momento, añadió que lo determinante sería evaluar si la acción impugnada le impone al confinado una restricción atípica, significativa o adicional a las restricciones a la libertad que le fueron impuestas originalmente como resultado de la sentencia dictada en su contra. Es decir, que el traslado será valido siempre que no altere las condiciones a su libertad impuestas por la sentencia dictada en su contra, tales como los beneficios de libertad bajo palabra, un aumento en los términos de la pena impuesta, y otros. En *Sadin*, esa Curia validó el traslado del confinado, tal como en los casos anteriores.

Luego de examinar la jurisprudencia federal antes citada, podemos apreciar que se evidencia una renuencia a reconocerle a los confinados un interés libertario bajo el debido proceso de ley cuando las condiciones de confinamiento a las que están sujetos dentro de los límites de la sentencia impuesta por el Tribunal. *Sandin v. Conner*, *supra*.[34]

En conclusión, el acto de trasladar a un confinado a otra institución correccional, *en ausencia de reglamentación estatal aplicable*, no menoscaba el derecho al debido proceso de ley garantizado constitucionalmente. *Meachum v. Fano*, *supra*. Por lo tanto, las agencias concernidas generalmente tienen *amplia discreción* para efectuar traslados conforme a la doctrina del debido proceso de ley, siempre que no haya alguna otra legislación vigente que regule esa discreción administrativa. *Id.*[35] Por tanto,

---

[33] "Confinement in another State, . . . is 'within the normal limits or range of custody which the conviction has authorized the State to impose'". *Olim*, *supra*, pág. 247.

[34] En el caso de *Sandin v. Conner*, *supra*, el Tribunal Supremo federal insertó un nuevo requisito para analizar cuáles son los intereses privados del debido procedimiento de ley que alegadamente hayan sido creados mediante legislación estatal. *Id.*, págs. 481-84. Así, ahora los tribunales deben requerirle a los confinados *que aleguen específicamente cuáles son los reglamentos o estatutos que hayan creado un interés libertario protegido por el debido procedimiento de ley*. *Id.*, págs. 483-85.

[35] En el caso de *Meachum* el Tribunal Supremo federal expresó:

> A prisoner's behavior may precipitate a transfer; and absent such behavior, perhaps transfer would not take place at all. But, as we have said, . . . **prison officials have the discretion to transfer prisoners for any number of reasons. Their discretion is not limited to instances of serious misconduct.** . . . Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.
>        Holding that arrangements like this are

continúa...

[35] **...continuación**

advertimos, que de estar delimitado el procedimiento de traslado de confinados por alguna reglamentación estatal, sería responsable entonces examinarla para adjudicar la legalidad de los traslados. *Id.*

V

El artículo 5 de la Ley Orgánica de la Administración de Corrección disponía, a la fecha en que se efectuó el traslado del recurrido, los deberes y las facultades conferidas al Administrador de Corrección;[36] a saber:

> (e) **Determinar,** conforme a la evaluación que     haga el personal a cargo del tratamiento o especialistas, y la reglamentación que promulgue la Administración a estos efectos, las instituciones operadas por ésta última **o por cualquier otra entidad gubernamental o privada en que habrá de ser ingresada, o a las que habrá de ser trasladada,** la clientela del sistema penal. El Administrador **podrá, asimismo, concertar acuerdos con entidades gubernamentales o privadas para el ingreso o traslado de la clientela** como parte de los programas de rehabilitación mediante trabajo, estudio, tratamiento **u otros medios que sean compatibles con la seguridad pública.**
> . . . .
>
> (n) **Administrar acuerdos de reciprocidad con otras jurisdicciones para la custodia y supervisión de los liberados y probandos.**
> . . . .
>
> (o) Establecer acuerdos o convenios con agencias públicas o privadas que faciliten la implantación [*sic*] de las funciones encomendadas en este Capítulo.[37]

Además, en su artículo 6(L), se faculta al Administrador a aprobar, enmendar y derogar reglamentos para estructurar dicha Ley Orgánica, los cuales tendrán fuerza de ley. 4 L.P.R.A. sec. 1113(L).

Al amparo de esos poderes, y según surge del récord, el 31 de enero de 1990 el entonces Gobernador de Puerto Rico, Honorable Rafael Hernández Colón, y la entonces Administradora de la Administración de Corrección, Dra. Mercedes Ramos  de  Otero, firmaron  el reglamento titulado *Procedimientos Para el Traslado de Sentenciados o de Confinados Sentenciados a Instituciones Penales en los Estados Unidos*. El reglamento fue aprobado con el propósito de precisar, organizar y procurar uniformidad en el trámite de traslado de personas recluidas bajo la custodia de la Administración de Corrección en Puerto Rico hacia instituciones penales de los Estados Unidos.

Surge del expediente, según anteriormente expuesto, que, en la carta de 2 de enero de 1991, la Administradora de la agencia le indicó a la recurrida Vélez Torres que su

---

> within reach of the procedural protections of the  Due  Process Clause would place the Clause astride the day-to-day functioning of  state  prisons  and  involve  the  judiciary  in  issues  and discretionary decisions that are not the business of . . . judges. . . . We decline to so interpret and apply the Due Process Clause. *Meachum v. Fano*, *supra*, pág. 228-29.

[36] Este artículo fue subsiguientemente enmendado para fines que no son pertinentes al caso de autos, por virtud de las siguientes leyes: la Ley Núm. 130 de 13 de diciembre de 1994; la Ley Núm.49 de 26 de mayo de 1995; y la Ley Núm. 155 de 20 de agosto de 1996.

hijo confinado, el recurrido Serrano Vélez, había sido trasladado a una institución federal en los Estados Unidos a raíz de un convenio establecido entre el Negociado Federal de Prisiones y la Administración de Corrección. Le indicó, además, que el traslado se había efectuado al amparo de la sección X(4) del citado reglamento que autorizaba este tipo de traslados en situaciones de emergencia. En la carta expresó la determinación de que la permanencia del confinado en el sistema correccional de Puerto Rico "representa un grave riesgo a la seguridad de confinados, empleados y la sociedad en general". La sección X(4) de dicho reglamento le concedía a la agencia amplia facultad para que recomendara el traslado de un sentenciado o confinado sentenciado, *inter alia*:

> **4.** En aquellos casos de emergencia que ameriten que el Administrador de Corrección tenga que ordenar el traslado de inmediato, para sacar de la jurisdicción de Puerto Rico al sentenciado o confinado sentenciado por cuestiones de seguridad.
>
> Cuando el Administrador de Corrección aplique esta disposición vendrá obligado a realizar un informe que contenga las razones que justifican el traslado en estas circunstancias.
> En los casos relacionados a los incisos 3[38] y 4 que anteceden **no se requerirá que el trámite de traslado se efectúe siguiendo el procedimiento establecido en este Reglamento,** ya que la naturaleza de ambas situaciones exige se actúe de inmediato. En atención a ello el Administrador de Corrección validará bajo su firma los documentos autorizando el traslado en estas circunstancias. (Énfasis suplido).

Sin embargo, a nuestro entender el Tribunal de Primera Instancia concluyó correctamente que el reglamento original de 1990, antes citado, no constaba inscrito en el Departamento de Estado para la fecha en que el recurrido fue trasladado a los Estados Unidos, según surge de una certificación expedida por dicho Departamento el 17 de abril de 1998.[39] Ello, a pesar de que la Sección XX de dicho reglamento exigía para su vigencia la radicación del mismo en el Departamento de Estado de conformidad con la LPAU.[40] Por

---

[37] 4 L.P.R.A. sec. 1112(e)(n) y (o). (Negrillas suplidas).

[38] El inciso 3 se refería a las instancias en que el confinado solicita por escrito al Administrador el traslado a una institución penal en los Estados Unidos. Esta circunstancia no está presente en el caso de autos, aunque sí están presentes las comprendidas bajo el inciso 4.

[39] Como parte de la prueba estipulada por las partes se encuentra copia de una carta de 16 de marzo de 1990 del Sr. Luis Rivera Román, Asesor del entonces Gobernador, dirigida al entonces secretario de Estado, Lcdo. Antonio J. Colorado, informándole el envío del mencionado Reglamento. Surge de dicha carta una nota a manuscrito que indica que la referida carta fue recibida por "Brenda" el 25 de marzo de 199_ (la copia de la carta no revela claramente el año). La parte recurrente se ampara en esta carta para alegar que el Reglamento fue remitido a tiempo al Departamento de Estado. No obstante, somos del criterio —al igual que el TPI— que dicha carta tiene escaso valor probatorio y por ende no controvierte o derrota la certificación oficial expedida por el Departamento de Estado que acredita el hecho de que el reglamento aprobado originalmente en 1990 no constaba radicado para la fecha del traslado del recurrido a los Estados Unidos.

[40] Específicamente, la Sección XX de dicho reglamento disponía que comenzaría a regir "a los treinta (30) días después de su radicación en el Departamento de Estado . . .". *Véase* Exhibit XXIII. Apéndice, pág. 424. Por otro lado, la sección 2.8 (a) de la LPAU dispone que:

esta razón, el TPI concluyó acertadamente que, no habiendo la Administración de

Corrección cumplido con el requisito de inscripción según exigía el propio reglamento

y la ley, el mismo carecía de fuerza legal[41] a la fecha del traslado del recurrido Serrano

Vélez. Por  consiguiente,  fue forzoso concluir que el reglamento original de 1990 no

era, en estricto derecho, aplicable a la situación del recurrido.[42] Como resultado, la

---

> Todo reglamento aprobado por cualquier agencia del Estado Libre
> Asociado  de Puerto Rico deberá ser presentado en el Departamento
> de Estado en español  en  original  y  dos (2) copias. Como
> **continúa...**

[40] **...continuación**

> regla general los reglamentos comenzarán a regir a los treinta (30)
> días después de  su radicación, a menos que:
>
> (1)  De otro modo lo disponga el estatuto con arreglo al cual
>    se adoptare el reglamento, en cuyo caso empezará a regir el
>    día prescrito por dicho estatuto,
>
> (2)  Como parte del reglamento, la agencia proscriba  una fecha
>    de vigencia posterior, si así lo dispusiere el estatuto que
>    autoriza a la agencia a promulgar dicho reglamento, o
>
> (3)  El reglamento sea uno de emergencia, según lo dispone la
>    sec. 2133 de este título . . .". 3 L.P.R.A. § 2128.

[41] "El proceso de reglamentación seguido por las agencias cubiertas por la Ley de Procedimiento Administrativo Uniforme tiene que ajustarse a lo delineado en esa ley. Si la regla o reglamento no se conforma y ajusta a lo establecido por dicha ley, **carecerá de fuerza de ley** y está impedida de sustituir el procedimiento de la ley so pena de que se vicie de nulidad la reglamentación adoptada". Demetrio Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, pág. 137 (1993)(énfasis suplido). 3 L.P.R.A. sec. 2127 ("una regla o reglamento aprobado . . . será nulo si no cumpliera sustancialmente con las disposiciones de este Capítulo"). Uno de esos requisitos es, como ya hemos señalado, la presentación del reglamento aprobado ante el Departamento de Estado. 3 L.P.R.A. sec. 2128. Por lo tanto, debemos concluir —al igual que lo hizo el TPI— que, por no haber cumplido con el requisito formal de presentación en el Departamento de Estado según lo exige la LPAU y lo exigía también el propio reglamento de 1990, el mismo carecía de fuerza legal a la fecha del traslado de Serrano Vélez y no podía ser aplicado a la situación de éste.

[42] Debemos, sin embargo, aclarar que el Tribunal de Primera Instancia expresó equivocadamente que el reglamento original del 1990 **"fue finalmente aprobado el 17 de marzo de 1993"**, según surge de la certificación expedida por el Departamento de Estado. Aunque ambos reglamentos —el de 1990 y 1993— poseen el mismo título, se trata de reglamentos distintos e independientes. Prueba de ello es que, aunque el lenguaje usado en ambos es idéntico,  la sección X del reglamento del 1990 (usado para efectuar el traslado del recurrido) contenía cuatro (4) incisos, mientras que el del 1993 tiene solamente tres (3).

Además, del expediente surge que el reglamento vigente es el número 4901, radicado en el Departamento de Estado el 31 de marzo de 1993. Según dispuso la sección XX de éste último, el mismo comenzaría "a regir en la fecha en que [fuere] suscrito por el Administrador de Corrección y por el Gobernador de Puerto Rico". De conformidad con la sección XX del reglamento, la entonces Administradora Interina de Corrección lo suscribió el 17 de marzo de 1993, y lo mismo hizo el Gobernador el 30 de marzo de 1993. A partir de ese momento comenzó a regir. Según la sección 2.8(a)(2) de la LPAU (un reglamento no comenzará a regir el día prescrito por ésta sección cuando

nulidad de dicho reglamento nos remite necesariamente a la doctrina constitucional del debido proceso de ley. Y debemos examinar, entonces, si dicha doctrina tuvo el efecto de viciar "fatalmente" el traslado del recurrido, tal como sostuvieron los tribunales apelados.

Somos del criterio que la doctrina del debido procedimiento de ley del Artículo II, Sec. 7 de la Constitución de Puerto Rico –*por si sola*– no le concede a los confinados un interés libertario que requiera ser protegido cuando son trasladados de una institución carcelaria a otra. Ello se basa en lo resuelto en *Meachum v. Fano*, *supra*, y *Olim v. Wakinekona*, *supra*. En ausencia de reglamentación aplicable, entendemos que las agencias concernidas –entiéndase, la Administración de Corrección– tienen *amplia discreción* para efectuar traslados conforme a la doctrina del debido proceso de ley. *Id. Véase Op. Srio. Just.* Núm. 39 de 1988 ("la Administración de Corrección puede trasladar a los cabecillas de los bandos que existan en las instituciones penales de Puerto Rico a instituciones penales en los Estados Unidos utilizando los mecanismos vigentes"); *Op. Srio. Just.* Núm. 21 de 1975 ("desde el punto de vista de la legislación local, es completamente permisible que el Administrador de Corrección suscriba acuerdos con autoridades estatales o federales para que convictos de nuestra jurisdicción cumplan sus sentencias en instituciones en los Estados Unidos").

Nuevamente, advertimos que de estar delimitado el procedimiento de traslado de confinados por alguna reglamentación estatal, será necesario examinar dicha

---

"como parte del reglamento, la agencia prescriba una fecha de vigencia posterior ..."). De hecho, se dispuso en el reglamento también que por la necesidad de su aprobación inmediata, la Administración de Corrección estaría exenta del requisito de publicación inmediata. Sin embargo –a diferencia del reglamento radicado en 1993– la sección XX del reglamento original de 1990 exigía expresamente como requisito para su vigencia la radicación del mismo en el Departamento de Estado, de conformidad con la sección 2.8(a) de la LPAU; algo que, según la certificación oficial del Departamento de Estado del 17 de abril de 1998, nunca ocurrió. Por lo tanto, concluimos que son reglamentos independientes.

regulación para adjudicar la legalidad del traslado. *Id.*[43]

Al aplicar la norma al caso de autos, la interrogante inicial, de si el confinado Serrano Vélez tiene un interés libertario constitucionalmente protegido que haya anulado su traslado a los Estados Unidos, debe contestarse en la negativa. Consecuentemente, resulta innecesario pasar a examinar y considerar la segunda cuestión requerida por la doctrina del debido proceso de ley: cuál era el procedimiento requerido por ley (*i.e.*, LPAU). *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562, 578 (1992); *Rivera Santiago v. Srio. de Hacienda*, *supra*, pág. 274. D. Fernández, *Derecho Administrativo*, *supra*, pág. 313.

En fin, por entender que el traslado efectuado en el 1990 no infringió interés libertario alguno del recurrente bajo la doctrina del debido proceso de ley, es nuestro criterio que erraron los tribunales aquí apelados al concluir que su traslado fue nulo por estar viciado "fatalmente".[44] La Administración de Corrección tenía discreción para efectuar el traslado. Es forzoso concluir, pues, que el traslado fue válido.[45]

Sin embargo, debe quedar claro que lo anteriormente expresado de ningún modo es una licencia para la violación de los derechos de los ciudadanos confinados por parte

---

[43] El examen de la legalidad de la actuación debe hacerse, sin embargo, teniendo en mente las expresiones del Tribunal Supremo federal en el caso de *Bell v. Wolfish*, *supra*, pág. 547-48:

> [T]he problems that arise in the day-to-day operations of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the providence and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. (Notas al calce, citas y comillas internas omitidas.)

[44] Somos conscientes de que "[s]on relativamente pocas las disputas procesales en el campo del derecho administrativo que se resuelven a través de la aplicación del debido proceso de ley. **[Sin duda e]l mayor número de disputas procesales se resuelve a través de la aplicación e interpretación de disposiciones estatutarias o reglas procesales de la agencia**". D. Fernández, *Derecho Administrativo*, *supra*, pág. 313 (énfasis suplido). Creemos que quizás ésa fue la razón por la cual los tribunales aquí apelados erraron. Es decir, que tanto el TPI como el TCA cometieron la equivocación de presumir de antemano que en el presente caso, el recurrido era acreedor de un derecho libertario protegido por el debido proceso de ley. Al así juzgar, obviaron la cuestión más *fundamental* del debido procedimiento de ley *procesal* que, como expresamos–, era averiguar primeramente si la Constitución le reconoce al reclamante un derecho libertario merecedor de protección. *Id.*

[45] Por otro lado, el recurrente no ha ofrecido prueba para demostrar que la actuación de la Administración de Corrección haya sido irrazonable o arbitraria bajo el debido procedimiento de ley y conforme a *Sandin v. Conner*, *supra*.

de la Administración de Corrección, y que por ello dicha agencia está exenta de dar cumplimiento al reglamento del 1993. Todo lo contrario; la Administración de Corrección viene obligada a dar entero cumplimiento a los reglamentos vigentes que ha aprobado. *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987). Ahora bien, debemos examinar cuál es el procedimiento que se exige en este caso, a la luz de la legislación y reglamentación *vigente*.

## VI

Como explicamos anteriormente, en el 1993 comenzó a regir el reglamento número 4901 titulado *Procedimiento para el Traslado de Sentenciado o de Confinados Sentenciados a Instituciones Penales en los Estados Unidos* para la Administración de Corrección. Este reglamento es, sustantivamente, idéntico al reglamento original del mismo título del 1990. A diferencia del de 1990, sin embargo, no cabe duda de que el reglamento de 1993 está vigente y rige la situación de autos, ya que fue aprobado conforme al procedimiento de reglamentación establecido en LPAU. Debido a ello, dicho reglamento excluye al presente la necesidad de recurrir supletoriamente a los procedimientos dispuestos en LPAU para solucionar el problema ante nos.

El reglamento del 1993 establece el procedimiento que la Administración de Corrección deberá seguir en los casos de traslado de confinados bajo su custodia a instituciones penales federales. En síntesis, este reglamento creó el "Comité de Traslados", organismo con la jurisdicción y competencia para recomendar al Administrador de la Administración de Corrección el traslado de los confinados a los Estados Unidos. El reglamento también exige que la agencia establezca un sistema de informes de ajuste y progreso del confinado en la jurisdicción federal. Específicamente, en su sección XIII establece el deber de la Administración de Corrección de evaluar periódicamente al confinado trasladado. Dispone que a base de estos informes es que el Comité evalúa si el confinado está apto para incorporarse al sistema penal de la Administración de Corrección de Puerto Rico:

    A. El Presidente del Comité podrá delegar en el Subdirector del Área de Instituciones Penales la responsabilidad de mantener, en coordinación con la institución penal en los Estados Unidos, un sistema de informes por escrito de ajuste y progreso del confinado que ha sido trasladado que permita evaluarlo a los fines de acreditarse las bonificaciones que más beneficien al confinado, refiriendo el asunto al Comité de Clasificación y Tratamiento correspondiente. La acreditación de las bonificaciones se hará conforme a las disposiciones reglamentarias sobre concesión, cancelación y restitución de abonos por buena conducta, trabajo y estudios que haya promulgado el Administrador de Corrección.

    **B.** Este intercambio de información sobre el confinado será **cada seis (6) meses** o tantas veces como sea necesario.

    C. El Presidente del Comité informará por escrito a los familiares del confinado, con copia al confinado de esta correspondencia, cuando sea requerida o a iniciativa propia.

D.  Todo informe, documento y correspondencia que se reciba de la institución donde fue trasladado el confinado, será sometido al Comité de Traslados por el Presidente para:

    1.  Verificar si el confinado será apto para incorporarse al sistema penal de la Administración de Corrección de Puerto Rico, o

    2.  Si deberá continuar en una institución penal en los Estados Unidos.

E.  El Comité se regirá en los casos de reintegro al sistema penal de Puerto Rico según lo dispuesto en la Sección II de este Reglamento.[46]

Consecuentemente, en vista de que el reglamento del 1993 está vigente y rige al presente la situación de autos, debemos concluir que la Administración de Corrección está obligada a dar cumplimiento a sus disposiciones. Específicamente, dicha agencia debe ejecutar a cabalidad el procedimiento de evaluación periódica dispuesto en la Sección XIII del mismo.[47]

VII

Finalmente, analizamos si erraron los tribunales recurridos al determinar que procedía el remedio interdictal (*injunction* preliminar) dictado el 29 de octubre de 1998. Entendemos que sí.

Este Tribunal ha establecido que para que proceda la emisión de un *injunction*, el promovente debe ofrecer prueba sobre cinco criterios determinantes: 1) la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el remedio solicitado; 2) la irreparabilidad de los daños alegados o la existencia de otro remedio adecuado en ley; 3) la probabilidad de que la causa se torne académica de no concederse el *injunction*; 4) la probabilidad de prevalecer de la parte reclamante al resolverse el litigio en su fondo; y 5) el impacto sobre el interés público. *Misión Industrial de P.R., Inc. v. Junta de Planificación de P.R.*, 97 J.T.S. 34, pág. 731. "El peso que se le dará a cada uno dependerá de los hechos particulares del caso". *Id*. Además, la concesión de un injunction preliminar descansa en el ejercicio de la sana discreción judicial, la que se desplegará ponderando las necesidades e intereses de todas las partes envueltas en la controversia. *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 790-91 (1994).

Por un lado, entendemos que el recurrido confinado no tiene daños que alegar, por razón de que su reclusión surge a raíz de su conducta delictiva, y su traslado por sus graves insubordinaciones dentro del penal. Tomando en consideración, además, que no actuó irrazonable ni arbitrariamente la Administradora de Corrección, Dra. Mercedes Ramos de Otero, y además que el traslado del confinado Serrano Vélez fue válido, no puede prevalecer el demandado en su reclamo. Por lo tanto, entendemos que fue incorrecta la determinación de los tribunales apelados de ordenar un *injunction* en contra de la parte demandada y, además, ordenar a la Administración de Corrección a hacer las gestiones

---

[46]  Sección XIII – Evaluaciones Periódicas.

correspondientes para adquirir la custodia del recurrido Serrano Vélez y regresarlo a Puerto Rico.

La facultad de la Administración de Corrección de efectuar el traslado fue, y es, incuestionable a la luz del derecho constitucional vigente. Por lo tanto, entendemos que erró el Tribunal de Circuito de Apelaciones al acoger los fundamentos del Tribunal de Primera Instancia al denegar la expedición de *certiorari*, confirmando así al tribunal de instancia. El *injunction* preliminar emitido por el Tribunal de Primera Instancia no es procedente. Estamos conformes con la sentencia emitida en el día de hoy mediante la cual revocamos, y ordenamos la desestimación de la acción presentada por los recurridos en vista de que no es procedente bajo las leyes federales y estatales invocadas por éstos.

No obstante, a la luz del derecho estatutario y reglamentario vigente aplicable a la Administración de Corrección, hemos ordenado a la agencia dar *entero e inmediato cumplimiento* a la Sección XIII del reglamento *Procedimiento para el Traslado de Sentenciados o de Confinados Sentenciados a Instituciones Penales de los Estados Unidos* de 31 de enero de 1993. El requerimiento de este Tribunal, según la sentencia emitida, debe ejecutarse inmediatamente, una vez recibida notificación de nuestro dictamen.


Baltasar Corrada del Río
Juez Asociado

---

[47] Entendemos además que para dar cumplimiento al reglamento vigente de 1993 no será necesario devolver al recurrido al sistema correccional de Puerto Rico, como resolvió el TPI.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Plácido Serrano Vélez;
Angélica Vélez Torres

    Demandantes-Recurridos

       v.

Estado Libre Asociado de       CC-98-1006      Certiorari
Puerto Rico; Departamento
De Corrección y Rehabilitación;
Nydia Cotto Vives, Secretaria;
Administración de Corrección,
Zoe Laboy, Administradora

    Demandados-Recurrentes


Opinión Disidente emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 18 de junio de 2001.

Por entender que la Administración de Corrección no tiene la autoridad legal para concertar acuerdos con entidades gubernamentales de otras jurisdicciones para el traslado de convictos reclusos en instituciones del Estado Libre Asociado, confirmaríamos la decisión del Tribunal de Primera Instancia que dejó sin efecto el traslado de Plácido Serrano Vélez a una institución correccional en los Estados Unidos.  Por ende disentimos de la Opinión de este Tribunal.

I

Las funciones y facultades que autoriza la Ley Orgánica de la Administración de Corrección, Ley

Núm. 116 de 22 de junio de 1974, 4 L.P.R.A. sec. 1101, et seq., según enmendada, contemplan exclusivamente la consecución de acuerdos inter-jurisdiccionales en ámbitos específicamente delimitados, como es la "custodia y supervisión de los liberados y probandos", 4 L.P.R.A. sec. 1112(n), y la obtención de ayudas federales o estatales para situaciones específicas, como el recibo de fondos y beneficios federales y el "intercambio de información", 4 L.P.R.A. sec. 1113(u).

Contrario a lo que afirma la Opinión del Tribunal, un análisis de la Ley Orgánica de la Administración de Corrección revela claramente que la Asamblea Legislativa otorgó la facultad a dicha agencia para entrar en convenios con el gobierno federal y los de los estados solamente en un contexto muy limitado y en circunstancias expresamente descritas en el estatuto.  Veamos.

En primer término, el Art. 5 de la Ley Núm. 116, *supra*, 4 L.P.R.A. sec. 1112, en su inciso (e), encomienda a la Administración de Corrección la determinación de aquellas instituciones a las que habrá de ingresarse o trasladarse a los reclusos y la autoriza a "concertar acuerdos con entidades gubernamentales o privadas" a esos efectos.  Dicho artículo autoriza a dicha agencia a:

> (e)   Determinar, conforme a la evaluación que haga el personal a cargo del tratamiento o especialistas, y la reglamentación que promulgue la Administración a estos efectos, las instituciones operadas por esta última o por cualquier otra entidad gubernamental o privada en que habrá de ser ingresada, o a las que habrá de ser trasladada, la clientela del sistema penal.
>
> […]
>
> **El Administrador podrá, asimismo, concertar acuerdos con entidades gubernamentales o privadas para el ingreso o traslado de la clientela como parte de los programas de rehabilitación mediante trabajo, estudio, tratamiento u otros medios que sean compatibles con la seguridad pública.**

La autorización de realizar tales convenios se repite en el inciso (o) de este mismo artículo, de forma más amplia.  Allí se permite llegar a acuerdos con entidades públicas o privadas con el fin general de implantar las disposiciones de la Ley Orgánica de Corrección. El segundo párrafo de este inciso, añadido en 1994, especifica los servicios susceptibles a acuerdos externos.  Sin embargo, dicha disposición de ningún modo autoriza convenios inter-jurisdiccionales.  Reza el inciso mencionado:

> (o)   Establecer acuerdos o convenios con agencias públicas o privadas que faciliten la [implantación] de las funciones encomendadas en este capítulo.
>
> Esta facultad incluirá la contratación de servicios de custodia y alimentación de los confinados, así como la contratación de la construcción, administración y mantenimiento de las instituciones penales con agencias o compañías privadas. La Administración establecerá los criterios y requisitos de facilidades físicas, organización, operación, personal administrativo y de custodia, y otros que estas instituciones deberán cumplir para tener acceso a esta contratación y ser acreditadas como instituciones privadas de custodia.

De otro lado, la única disposición que autoriza a la Administración a realizar acuerdos con otras jurisdicciones es el inciso (n) de la mencionada Ley.  En dicho acápite se autoriza a la Administración de Corrección a:

(n)   Administrar acuerdos de reciprocidad con otras jurisdicciones para la custodia y supervisión de los liberados y probandos.

**Del anterior inciso se desprende claramente que los convenios inter-jurisdiccionales autorizados por la Ley 116 se refieren únicamente a la "custodia y supervisión de los liberados y probandos", no a la de convictos cumpliendo una condena ordinaria de reclusión. La razón es evidente: los liberados o probandos podrían querer trasladarse a otras jurisdicciones en el legítimo disfrute de su libertad, pero requerir, no obstante, cierto nivel de supervisión, sea para efectos de velar por que cumplan las condiciones de su probatoria o, cuanto menos, que se notifique a las autoridades de su nueva residencia sobre sus antecedentes penales. La posibilidad de un cambio de residencia voluntario hace necesaria la coordinación entre jurisdicciones, especialmente si aún no se ha extinguido plenamente la sentencia del convicto. Por ello, la disposición de la Ley Orgánica de la Administración de Corrección que permite tales convenios no hace más que reconocer y avalar la movilidad de los liberados y probandos.**

La Ley Orgánica de la Administración de Corrección, sin embargo, no hace referencia a la facultad de la agencia de realizar convenios con otras jurisdicciones para el traslado de confinados. Éstos, contrario a los liberados o probandos, no tienen libertad de movimiento, por lo que un convenio que autorice o haga viable su traslado no es un mero acto de coordinación inter-jurisdiccional para afrontar una realidad extra-judicial, sino la gestión de actos afirmativos que afectan los intereses libertarios, por atenuados que sean, de los reclusos.

Es una consabida norma de hermenéutica que los estatutos deben ser interpretados en su totalidad para así dar un significado armónico a cada una de sus partes. R. E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, págs. 315-18 (2ª ed. 1987). También es regla interpretativa la que manda a presumir que el legislador no hace cosas fútiles, por lo que la inclusión expresa en un estatuto de una disposición particular, como es una función, facultad o potestad administrativa, sugiere la exclusión de aquellas disposiciones no mencionadas. Flamboyán Gardens v. Junta de Planificación, 103 DPR 884, 888 (1975). Entendemos aplicable esta normativa al caso de autos.

La mención específica de las circunstancias en las que se autorizan los convenios con otras entidades de los gobiernos federal y estatales excluye, por implicación, otros tipos de acuerdo. La correcta hermenéutica lleva a suponer que, según las mencionadas disposiciones legales, la autorización para convenir pactos con la jurisdicción estatal y federal se otorgó para el caso específico que atañe a la "supervisión de liberados y probandos". De haber querido el legislador hacerla extensiva a otras situaciones, así lo habría dispuesto en la legislación original o en las enmiendas realizadas al inciso (e) en 1978, 1989 y 1994 y al inciso (o) en 1978 y 1994. Es una actuación judicial impropia

añadir poderes a una agencia por medio de la extralimitación en la interpretación del estatuto. La lectura correcta de la Ley 116, *supra*, limita necesariamente la capacidad de la Administración de Corrección de entrar en acuerdos inter-jurisdiccionales a los casos dispuestos en el inciso (n). Por tanto, las "entidades gubernamentales o privadas" a las que se refieren los incisos (e) y (o) deben entenderse como instituciones del Estado Libre Asociado de Puerto Rico, no del continente.

Por otro lado el Art. 6 de la Ley 116, supra, 4 L.P.R.A. § 1113, otorga ciertas facultades adicionales a la Administración de Corrección. También aquí se delega a dicha agencia la facultad de llegar a acuerdos con agencias de los gobiernos federales y estatales, pero nuevamente la circunscribe a situaciones y contextos determinados:

> (u)  Solicitar y obtener ayuda o asistencia en dinero, bienes o servicios del Gobierno de los Estados Unidos, los Estados Federados, el Gobierno del Estado Libre Asociado de Puerto Rico, o cualquiera de sus agencias, corporaciones públicas o subdivisiones políticas, para los propósitos de este Capítulo, de conformidad con la legislación, reglamentación, acuerdo o contrato aplicable.

> Se autoriza al Gobernador para designar al Administrador y a la Administración como el funcionario y la agencia que tendrán a su cargo administrar cualquier programa federal que, por su naturaleza, propósito y alcance, esté relacionado con las funciones que se encomiendan a la Administración por este Capítulo. **En esta capacidad, el Administrador deberá concertar y tramitar los convenios o acuerdos necesarios para realizar las gestiones para que el Estado Libre Asociado de Puerto Rico pueda recibir todos los fondos y beneficios federales para llevar a cabo dichos programas, así como concertar y tramitar convenios y acuerdos con los correspondientes organismos gubernamentales de los Estados Federados y del Gobierno Federal, debidamente autorizados para ello, con respecto a intercambio de información sobre programas, estudios e investigaciones relacionados con los programas que lleve a cabo; siempre y cuando dichos convenios o acuerdos estén dentro del marco de sus funciones y de las leyes del Estado Libre Asociado de Puerto Rico.** (Énfasis suplido).

Una lectura de este inciso lleva a la conclusión que la autorización estatutaria de realizar convenios y acuerdos con el gobierno federal y el de los estados busca, exclusivamente, la mejor y más eficiente tramitación de recursos para utilizarse en las instituciones del Estado Libre Asociado.

La Opinión del Tribunal interpreta la asistencia "en dinero, bienes y <u>servicios</u> del Gobierno de los Estados Unidos, [y] los Estados Federados" (énfasis suplido) como licencia para acordar el traslado de convictos reclusos a instituciones en el continente. La lectura conjunta del primer y segundo párrafo, no obstante, clarifica y circunscribe el ámbito de dicha asistencia a "fondos y beneficios federales" y a "intercambio de información sobre programas, estudios e investigaciones relacionados con los programas que lleve a cabo".

Si además tomamos en consideración que esta autorización a firmar convenios se limita a asuntos referentes a la supervisión de liberados y probandos, es evidente que la Administración de Corrección no tiene los poderes que le atribuye la Opinión del Tribunal.

II

Finalmente, cabe destacar que, en materia tan delicada como el confinamiento y la rehabilitación de convictos así como en los procesos de justicia criminal que anteceden a la convicción, debe observarse el mayor cuidado al definir y delimitar los poderes de las agencias estatales.

Las condiciones geográficas de la isla de Puerto Rico incrementan la gravedad del traslado de cualquier confinado, al dificultar todavía más su relación con su familia. El castigo es particularmente oneroso dada la condición social de la vasta mayoría de los confinados, cuyas familias no pueden costear visitas regulares al continente.

Ante este escenario, no podemos concurrir con la interpretación tan amplia que hace la Opinión del Tribunal sobre el alcance de los poderes delegados por la Asamblea Legislativa a la Administración de Corrección en lo referente a los convenios para el traslado de confinados. Los principios de interpretación judicial, garantías de consistencia y mesura en nuestros dictámenes y del debido respeto a las ramas políticas de gobierno, nos indican una dirección distinta. Por ello, como entendemos que la Administración de Corrección no tiene la facultad legal para trasladar confinados puertorriqueños al extranjero, disentimos.


                              FEDERICO HERNÁNDEZ DENTON
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Plácido Serrano Vélez;
Angélica Vélez Torres

     Demandantes–Recurridos

        vs.                                    CC–1998–1006     Certiorari

Estado Libre Asociado de
Puerto Rico; Departamento
de Corrección y Rehabilitación;
Nydia Cotto Vives, Secretaria;
Administración de Corrección,
Zoe Laboy, Administradora

     Demandada–Peticionaria

Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 18 de junio de 2001.

Frente a los planteamientos ante nos de los recurridos en el caso de autos, y frente a los señalamientos también de los foros a quo, una mayoría del Tribunal estima que la madre de un confinado no tiene un derecho constitucional a visitar o relacionarse con éste, ni el confinado con su madre. Estima, además, que a un confinado de Puerto Rico, encarcelado en el país, no le ampara el debido proceso de ley, de modo que puede ser trasladado a una prisión de Estados Unidos por mero *fiat* de los funcionarios de la Administración de Corrección, sin que se le notifique previamente de ello al confinado, sin celebrar una vista previa, y sin escuchar de modo alguno el parecer del confinado; es decir, que el confinado carece de interés libertario alguno que esté protegido por las garantías constitucionales del debido proceso de ley.

Por los fundamentos que expreso brevemente a continuación, disiento de la postura referida de una mayoría del Tribunal.

I

El problema principal del dictamen mayoritario en el caso de autos es, en mi criterio, que no se le da peso o consideración adecuada alguna a varias disposiciones y rasgos de nuestra propia Constitución –la del Estado Libre Asociado de Puerto Rico– que son pertinentes y decisivas con respecto a los asuntos en cuestión aquí.  Por ello, es menester hacer unas expresiones sobre el particular, aunque sólo sean de carácter esquemático. Veamos.

A.

Una de las más notables corrientes de desarrollo del derecho constitucional norteamericano en la actualidad consiste de lo que se conoce como el **constitucionalismo estatal** ("state constitutionalism"). Se trata de la incursión vigorosa de los tribunales estatales en la defensa de los derechos fundamentales de las personas, amparados en las disposiciones de sus propias constituciones estatales.[48] Este desarrollo fue impulsado en gran medida por uno de los más eminentes juristas contemporáneos de Estados Unidos, el Juez William Brennan, quien en 1977 abogó por el crecimiento del constitucionalismo estatal. Dijo entonces que:

> "State courts should thrust themselves into a position of prominence in the struggle to protect the people of our nation from government intrusions on their freedoms." William J. Brennan, <u>State Constitutions and the Protection of Individual Rights</u>, 90 Harvard Law Review 489, 503 (1977).

---

[48] Para un recuento crítico de este desarrollo véase P.W. Kahn, <u>Interpretation and Authority in State Constitutionalism</u>, 106 Harvard Law Review 1147 (1993).

En Puerto Rico, desde hace varias décadas, este Tribunal ha estado atendiendo diversas situaciones relativas a los derechos fundamentales, amparado en nuestra propia Constitución, para proteger y afianzar esos derechos más allá de las garantías que ofrece la Constitución federal según interpretada por el Tribunal Supremo americano. Hemos partido de la premisa fundamental de que nuestra propia Constitución "reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos". López Vives v. Policía de P.R., 118 D.P.R. 219 (1987). Es trillado ya en nuestros círculos jurídicos que nuestra Constitución tiene una "factura más ancha" que la federal en lo que se refiere a la generalidad de los derechos fundamentales de las personas. Véase E.L. Chiesa, Los Derechos de los Acusados y La Factura más Ancha, 65 Rev. Jur. U.P.R. 83 (1996); y Emp. Pur. Des., Inc. v. H.I.E.Tel., Opinión de 11 de mayo de 2000, 150 D.P.R. ___, 2000 TSPR 71, 2000 JTS 83. Nuestra Constitución, además, consagra algunos derechos que no están protegidos por la Constitución federal.

Es a la luz de lo anterior que resulta sorpresivo e inaceptable el dictamen mayoritario en el caso de autos. En este se decreta un curso de acción con respecto a un confinado, sin que se examine de modo cabal alguno cómo se aplican a la situación ante nos diversas disposiciones de nuestra propia Constitución, que son de factura más ancha que la federal o que son autóctonas.

Así pues, no se examina a fondo cómo aplica a la situación referida la Sección ocho del Artículo II de nuestra Constitución, que le garantiza a toda persona la protección de ley contra ataques abusivos a su vida privada o **familiar**. En vista del amplio desarrollo jurisprudencial de esta sección de nuestra Carta de Derechos, cabe preguntarse si ésta no protege la relación familiar íntima que existe entre una madre y un hijo, al menos para garantizar que esa relación no pueda ser conculcada por el Estado en algún caso sólo porque involucre a un confinado. Las personas encarceladas no dejan de ser madres o hijos sólo por ese hecho, ni el encarcelamiento por sí solo destruye los hondos vínculos de afecto y sustento que de ordinario existen entre una madre y su hijo, que son incluso de naturaleza sagrada. ¿Puede entonces el Estado impedir sin límite alguno la preservación de la vida familiar del confinado cuando la Constitución nuestra preconiza la protección de la vida familiar de toda persona como una de sus garantías más fundamentales?

B.

Intimamente relacionado con lo anterior está la Sección 19 del Artículo VI de nuestra Constitución que declara que:

"Será política pública del Estado Libre Asociado... reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender... al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social."

Cabe preguntarse si impedir que una madre visite a su hijo confinado es de algún modo consistente con el mandato constitucional de hacer posible la rehabilitación moral y social de éste. No se requiere ser un especialista en las ciencias de la conducta para comprender que privar a un confinado del continuado afecto y sustento que su madre le ofrece no sólo no abona nada a la rehabilitación del confinado sino que, por el contrario, la entorpece. Esta es otra disposición de nuestra propia Constitución cuyos efectos e implicaciones son ignorados por la mayoría en su dictamen en este caso.

C.

Finalmente, es menester señalar que este Tribunal ha interpretado la garantía del debido proceso de ley en términos muy amplios, de manera más liberal que el Tribunal Supremo de Estados Unidos. Para comprobar la diferencia, basta con comparar lo resuelto en relación a vistas previas para la suspensión de policías acusados de cometer delitos graves. En <u>Díaz Martínez v. Policía de P.R.</u>, 134 D.P.R. 144 (1993), resolvimos que a un policía, contra el cual un tribunal había encontrado causa probable para acusarlo por varios cargos de delitos graves distintos, se le había violado el debido proceso de ley al suspendérsele de su empleo luego de una investigación administrativa de los cargos referidos, debido a que tal suspensión se efectuó sin vista previa. En cambio, el Tribunal Supremo de Estados Unidos, en <u>Gilbert v. Homar</u>, 117 S.Ct. 1807 (1997), resolvió que a un policía estatal arrestado por la alegada comisión de un delito grave relacionado con drogas, no se le violaba el debido proceso de ley por suspendérsele del empleo sin vista previa.

Con arreglo a lo anterior, no cabe duda de que el debido proceso de ley de nuestra propia Constitución es más exigente que el de la Constitución federal en lo relativo a la celebración de vistas previas. En el caso de autos, al confinado en cuestión se le trasladó de una cárcel en Puerto Rico a una localizada en Estados Unidos sin celebrarse antes una vista sobre el traslado. Es incuestionable que dicho traslado aparejaba graves consecuencias adversas para el confinado. Significaba que el confinado no podría recibir el sustento afectivo y moral que representaban las visitas de su madre; que estaría recluido en un lugar en el cual no se hablaba su vernáculo, obstaculizando así las comunicaciones más esenciales del confinado; y que probablemente tendría que sufrir los estragos del discrimen contra las minorías, que son tan notorios en las prisiones norteamericanas. El traslado, pues, constituía **agravar seriamente el castigo del confinado**, sin que un tribunal hubiese dictado una sentencia aumentando su pena. Este oneroso traslado se dispuso por mero *fiat* administrativo, porque alegadamente el confinado era un sujeto peligroso. Al amparo de la factura más ancha de nuestro debido proceso de ley, parecería indispensable que se hubiese celebrado una vista previa al traslado, para escuchar lo que tuviera que decir el confinado, sobre todo para permitirle cuestionar la validez de la opinión del Administrador de Corrección de que dicho confinado representaba un riesgo grave a la seguridad institucional. La mayoría de este Tribunal estima que no se le violó el debido proceso de ley al confinado, aunque el asunto no se examina de

ningún modo adecuado a la luz de la factura más amplia de nuestra propia garantía del debido proceso de ley.

## II

En resumen, pues, el dictamen mayoritario en el caso de autos se emite al margen de lo que dispone nuestra propia Constitución. Se omite en ese dictamen la consideración de varios principios medulares que se originan en el principio cardinal que informa nuestra Ley Fundamental de que la dignidad del ser humano es inviolable. Ese principio cardinal ampara también a los confinados. Por deleznable que haya sido la conducta que causó su reclusión, los confinados no dejan de ser personas humanas con una dignidad propia por ese hecho, que el Estado viene obligado a respetar. Autorizar el traslado en cuestión sin cortapisa constitucional de ninguna especie, como lo hace la mayoría en su dictamen aquí, no sólo contraviene el valor más fundamental de nuestra Carta de Derechos sino que además permite la creciente deshumanización de los confinados, lo que va en contra de nuestras creencias más esenciales. Por todo ello, disiento.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO